AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
07/16/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
07/16/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KH _____ DEPUTY

United States of America

v.

SHAWN WILLIAM HARPER and
JORDAN REECE BROWN,

Case No. 8:21-mj-00491-DUTY

Defendant.

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 18, 2021 in the county of Orange in the Central District of California, the

defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708, 2(a) | Possession of Stolen Mail |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Marlayna Waters, Postal Inspector, USPIS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:       7/16/2021                        /s/ Autumn D. Spaeth
                                              *Judge's signature*

City and state:  Santa Ana, California        Hon Autumn D. Spaeth, U.S. Magistrate Judge
                                              *Printed name and title*

AUSA Bradley E, Marrett (x3505)

## **AFFIDAVIT**

I, Marlayna Waters, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.   I am a United States Postal Inspector ("PI") employed by the United States Postal Inspection Service, Los Angeles Division, in Los Angeles, California.  I have been so employed since April 2021.  I am currently assigned to the Long Beach Mail Theft team, where my responsibilities include the investigation of crimes against the United States Postal Service and crimes related to the misuse of and attacks on the mail system, including theft of the United States mail; possession of stolen mail; and crimes related to the use, theft, or counterfeiting of postal keys (referred to as "arrow keys") and locks.  As part of the Mail Theft team, I also investigate crimes in connection with access devices that include credit cards and debit cards, identity theft, and unauthorized use of others' information for financial gain, as these criminal schemes have been known to be perpetrated through the U.S. Mail.

2.   Previously, I was a Special Agent with the United States Secret Service, where I was employed from January 2016 through April 2021. I was assigned to the Los Angeles Counterfeit Squad and Protective Intelligence Unit, where my area of focus was financial and fraud investigations, and threat-based intelligence cases.

## II.   <u>PURPOSE OF THE AFFIDAVIT</u>

3.   This affidavit is made in support of a criminal complaint against and arrest warrants for Shawn William HARPER ("HARPER") and Jordan Reece BROWN ("BROWN") for a violation of Title 18, United States Code, Sections 1708 and 2(a) (Possession of Stolen Mail).

4.   This affidavit is also made in support of an application for a warrant to search the thirteen digital devices (SUBJECT DEVICES 1-13, collectively, the "SUBJECT DEVICES") seized on or about June 18, 2021, as described more fully in Attachment A, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1704 (Possession of a Counterfeit or Unauthorized Postal Key), 1708 (Possession of Stolen Mail), 1028 (Fraud in Connection with Identification Documents), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), 371 (Conspiracy), and 1344 (Bank Fraud), (collectively the "Subject Offenses"), as described further in Attachment B.  Attachments A and B are incorporated by reference.

5.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

### III.   DIGITAL DEVICES TO BE SEARCHED

6.   The digital devices to be searched are currently in the custody of the Tustin Police Department ("TPD"), under case number 21-3893, described as follows:

a.   Grey Samsung Tablet, model number SM-T860 ("SUBJECT DEVICE 1");

b.   White Apple iPad, with serial number F4MK4UEF196 ("SUBJECT DEVICE 2");

c.   White Apple iPhone ("SUBJECT DEVICE 3");

d.   Black Apple iPhone, with serial number 579C-E3085A ("SUBJECT DEVICE 4");

e.   Black Galaxy Samsung S8, with serial number 352157090356801 ("SUBJECT DEVICE 5");

f.   Black and Silver LG cellular telephone ("SUBJECT DEVICE 6");

g.   Grey and Black LG cellular telephone, with serial number 358309781798155 ("SUBJECT DEVICE 7");

h.   Black Samsung cellular telephone, with serial number 352741115466156 ("SUBJECT DEVICE 8");

i.   Black 32GB Scandisk USB drive ("SUBJECT DEVICE 9");

j.   Red 16GB USB drive ("SUBJECT DEVICE 10");

k.   Black and Yellow, 16GB, Monster Digital USB drive ("SUBJECT DEVICE 11");

l.    Black Asus laptop computer, with serial number M3NOCX069003108 ("SUBJECT DEVICE 12"); and

m.    White and Silver credit card reader, with serial number 0821327184 ("SUBJECT DEVICE 13").

7. The SUBJECT DEVICES are more fully described in Attachment A, which is incorporated fully herein by reference.

### IV. <u>SUMMARY OF PROBABLE CAUSE</u>

8. At approximately 11:32 a.m. on June 18, 2021, in Tustin, California, TPD Officer David Paine ("Officer Paine") conducted a traffic stop on a vehicle with no front license plate and an expired registration. Officer Paine detained the driver, HARPER, and the passenger, BROWN, for possessing various contraband. Officer Paine and other TPD officers conducted a search of the vehicle and found, among other things: (1) numerous debit and credit cards bearing names other than HARPER or BROWN; (2) multiple driver licenses bearing names other than HARPER or BROWN (3) a counterfeit postal arrow key; (4) the SUBJECT DEVICES; (5) blank checks bearing names other than HARPER or BROWN; (6) approximately 90 sheets of blank check paper (7) a printer, card printing material and label maker; (8) white blank plastic cards; (9) pieces of mail matter not from or addressed to HARPER or BROWN; (10) Social Security cards bearing names other than HARPER or BROWN; and (11) three notebooks containing handwritten personal identifying information for people other than HARPER or BROWN.

## V.  <u>STATEMENT OF PROBABLE CAUSE</u>

9.   Based on my reviews of reports from TPD, the items of evidence seized, and conversations with law enforcement, I learned the following:

### A.   **TPD Officers Initiate a Traffic Stop of HARPER and BROWN**

10.   On June 18,2021, at approximately 11:32 a.m., while TPD Officer Paine was working uniformed patrol and driving a marked police unit, he observed a black BMW ("BMW") with no front license plate at the intersection of First Street and C Street in Tustin, California.  Additionally, a records check of the vehicle's license plate indicated the registration had expired as of October 2020. Officer Paine conducted a traffic stop of the BMW.

11.   The BMW continued to drive west on First Street and passed several safe places to yield. Officer Paine drove behind the BMW at a slow rate of speed for approximately two blocks. The BMW eventually pulled into the driveway of a gas station located at 395 West First Street. As the BMW pulled into the gas station, Officer Paine observed the front passenger side door open. The front passenger opened the door in a manner that led Officer Paine to believe that they were attempting to flee from the BMW. Officer Paine got out of his car and gave verbal commands for the front passenger to close the door.  The passenger complied with Officer Paine's order.

12.   Officer Paine approached the vehicle, where he encountered the driver, later identified as HARPER.  Officer

Paine asked HARPER for his driver's license, to which he replied
he did not have it on him.  Officer Paine then asked the female
passenger, later identified as BROWN, for her name and date of
birth.  Brown provided Officer Paine with a name of Chelsea
Boyd, and a date of birth of XX/XX/98.

13.  Officer Paine requested a records check of HARPER and
BROWN through TPD dispatch.  While waiting for a records check,
Officer Paine advised HARPER to step out of the BMW.  As HARPER
was stepping out of the BMW, Officer Paine noticed a knife
concealed in the drivers' side door panel.  Officer Paine then
conducted a pat down search of HARPER.  As Officer Paine came to
HARPER'S front left pants pocket, he could feel an object with a
long stem and round bulbous end.  Based on his training and
experience, Officer Paine recognized the object to be consistent
with the shape and feel of a concealed methamphetamine pipe,
which are commonly made of glass, can shatter easily, and be
used as potential weapons.  Officer Paine removed the pipe from
HARPER'S pocket for safety, and as he did so, he noticed the
pipe was coated throughout with an off-white powder like
substance.  Officer Paine also noticed the round bulbous end had
an opening on one side and burn marks on the other.  Based on
Officer Paine's experience and training, he recognized the
substance to be methamphetamine.

**B.   TPD Officers Find A Postal Arrow Key, Access Devices,
       Identification Cards, and Banking Statements in
       Others' Names in HARPER and BROWN's Possession**

14.  As Officer Paine completed a pat down of HARPER,
Officer Toth arrived on the scene to assist with the

investigation.  Officers Paine and Toth then began to search HARPER'S vehicle for additional evidence of his narcotics violations.  The officers then found and seized the following from within the center console:

a. Keys which Officer Paine believed to be United States Postal Service ("USPS") "arrow keys"[1].

b. Multiple credit cards and blank checks that were in names of persons other than HARPER and BROWN.

15. HARPER was then taken to the rear seat of Officer Paine's patrol vehicle, where he was seated for the remainder of the investigation.  Officer Paine then spoke with BROWN. Officer Paine asked BROWN if there was anything illegal inside the vehicle, to which BROWN stated there was "fraud" inside the vehicle.  BROWN also informed Officer Paine of a methamphetamine pipe in her purse.  Given this information, BROWN was detained pending further investigation.  After detaining HARPER and BROWN, Officer Paine was assisted with an additional search of the BMW by other TPD officers.

16. As officers continued to search the vehicle, they found and seized the following items from the from front passenger area:

---

[1] An "arrow key" is a specialized key that USPS employees carry and which is used to access USPS mail receptacles such as the following: USPS collection boxes, apartment buildings (to access interior mail boxes), and neighborhood delivery collection box units, among others.  These keys are often times the target of criminals who know of their existence and know how they can be used.  They are often counterfeited by criminals seeking to steal U.S. mail.

     a.   Additional credit cards, blank checks, and DMV paperwork that had been issued to persons other than HARPER or BROWN.

     b.   A purse belonging to BROWN.  Officer Paine searched the purse and located what he believed was an additional methamphetamine pipe.  He also located a small zip-up bag and round plastic vessel that contained a brown tar like substance, which appeared to be sticky and smelled heavily of vinegar.  Based on Officer Paine's training and experience, he recognized the substance to be consistent with heroin.  Also found within BROWN'S purse were, among other things: (1) numerous debit and credit cards bearing names other than BROWN; (2) multiple driver licenses bearing names other than BROWN; (3) DMV paperwork in names other than BROWN; and (4) two cell phones (SUBJECT DEVICES 5 and 6).

     c.   Two notebooks that contained handwritten personal identifying information ("PII") for people other than HARPER or BROWN.

    17. Also inside the purse, Officer Paine located a driver's license that had been issued to Chelsea Boyd.  Upon looking at the license, Officer Paine noticed the picture on the license did not match the appearance of BROWN.  Officer Paine then spoke with BROWN who admitted she had given him someone else's name for her identification.  BROWN stated her actual name was Jordan BROWN, with a date of birth of XX/XX/93.  BROWN had recited Chelsea Boyd's name, date of birth, physical descriptors, and address by memory.  BROWN told Officer Paine

that Chelsea Boyd was her friend, whose identity she used to avoid arrest.  BROWN then stated to Officer Paine she was on active probation with search and seizure terms and had a warrant for her arrest.

18. As officers continued to search the vehicle, they found and seized the following items from the trunk of the vehicle:

      a.  A printer.

      b.  A credit card reader (SUBJECT DEVICE 13).

      c.  A black bag, which contained numerous forms of suspected stolen PII, a notepad containing handwritten PII for people other than HARPER or BROWN, and check making materials.

      d.  A red zip-up bag, which contained unopened mail, credit and gift cards, birth certificates, rental agreements, DMV paperwork, and blank checks in names other than HARPER or BROWN.

      e.  A blue duffle bag, which contained an Asus laptop computer (SUBJECT DEVICE 12) and a lower receiver for a personally manufactured firearm (i.e., a "ghost gun").  The duffle bag contained male clothing like that which HARPER was wearing during the traffic stop.  The handgun receiver was black in color and made from a polymer plastic material, which Officer Paine recognized to be consistent with a "P80" or polymer 805 complete receiver.  This receiver appeared to have been manufactured and completed so it could be readily assembled into a functioning firearm.  A frame or receiver of a

firearm is prohibited from possession by convicted felons, which a record check later indicated HARPER was.[2]

 f. Inside of a white shoe, officers found altered bank notes next to a check in the name of someone other than HARPER or BROWN.  The bank notes appeared to be one-dollar bills that had been stripped of most of their ink.  Based on my training and experience, I know that it is common to manufacture counterfeit $100 bills using "washed" $1 bills, that is, $1 bills which have been stripped of most of their ink.

19. The remaining SUBJECT DEVICES not specifically identified in paragraphs 16 and 18 were recovered from various locations in the BMW, including in the trunk and the center console.

 C. **TPD Officers Conduct an Initial Mirandized Interview of HARPER and BROWN**

20. After advising HARPER of his Miranda rights, Officer Paine interviewed HARPER on scene and reported that HARPER stated the following:

 a. HARPER informed Officer Paine that the handgun receiver in the duffle bag was his.  HARPER had intended to complete it, but BROWN had convinced him not to.  HARPER stated that he and BROWN lived together and had been in a dating

&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;

[2] Based on my review of law enforcement databases, I know that HARPER has sustained at least the following felony convictions: (1) receiving known stolen property; (2) oral copulation with a person under 16; (3) possession of controlled substances; (4) possession of ID of over ten people with intent to defraud; (5) unauthorized use of others' ID and; (6) felon in possession of a firearm in violation of the California Penal Code.

relationship for approximately three years.  HARPER told
Officer Paine he was responsible for the items related to fraud
that had been discovered in the vehicle.

21. Officer Paine then conducted a Mirandized interview of
BROWN on scene and reported that BROWN stated the following:

a.  BROWN said she was aware of the fraud-related
items that were in the vehicle.  BROWN also confirmed she had
been in a live-in dating relationship with HARPER for
approximately three years.

22. Officer Paine then transported HARPER and BROWN to the
TPD station for booking and additional interviews.

**D.   Recorded Mirandized Interview of BROWN**

23. Upon arrival at TPD, Officer Paine conducted a more
in-depth interview with BROWN.  After re-advising BROWN of her
Miranda rights, Officer Paine reported that BROWN stated the
following:

a.  BROWN said she knew there was a large amount of
fraud-related items in the vehicle.  Regarding her relationship
with HARPER, BROWN stated they had been in a relationship for
three years and had lived together most of that time.  BROWN
indicated they had been staying together at the Bel Air Motel
(140 West First Street, Tustin, California) and had just moved
out of their room.  BROWN stated that their collective items
from the motel were then loaded into the BMW.  BROWN said
HARPER was responsible for the fraud related items found in the
vehicle.  Officer Paine indicated that it was highly unlikely
BROWN wouldn't have more knowledge of HARPER'S criminal

activity, as they had been together for three years.  BROWN became visibly frustrated and stated it was their "last time". BROWN said she and HARPER were "Done", implying they were trying to cease their fraudulent activities.

    b.  Officer Paine questioned BROWN regarding the false name she had given at the scene.  BROWN stated that Boyd was a friend of hers and she used Boyd's name to check into hotels.  BROWN explained she was on the run from her probation officer and knew that using Boyd's name wouldn't raise any questions on a hotel registry.  BROWN stated she only used other people's identification to get hotel rooms.  She indicated that because she so closely resembles the photos in the ID's, she can get a room under those names.  BROWN said it keeps her name from the hotel registries and makes detection by law enforcement much less likely.

    c.  Regarding the credit cards in third party names, BROWN stated they were just pre-paid cards and weren't yet activated.  When asked how she knew the cards weren't activated, BROWN said she had obtained the cards from HARPER. She further explained that people brought stolen mail to HARPER, and she got the cards from him that way.  BROWN later stated she gets the cards from HARPER because she's "on the run".

    d.  BROWN was asked about the counterfeit arrow keys that were in the vehicle.  She denied they were for mail theft, instead stating they were used for auto theft.  BROWN later stated she didn't know what HARPER used the keys for.  When

asked for clarification, BROWN stated that people bring stolen mail to HARPER two to three times a day.

### E.   Recorded Mirandized Interview of HARPER

24. After conducting an interview of BROWN, Officer Paine conducted a more in-depth interview with HARPER.  After re-advising HARPER of his Miranda rights, Officer Paine reported that HARPER stated the following:

a.  HARPER stated he knew he was in trouble for fraud because he had checks, a printer he used to make checks, and various identification cards for males and females.  HARPER then confirmed BROWN had been using the identification cards as well.

b.  HARPER stated people bring him mail to make them checks.  HARPER stated he gets the mail from his friend who knows the combination to a USPS lock box outside of a Pilot truck stop located at 6605 North Indian Canyon Drive, Palm Springs, California.  His friend collects mail from the drop boxes and brings it to HARPER.

c.  Referencing the credit card reader, HARPER stated it had been given to him, but he did not believe it worked.  He stated the cards in his possession had not been overwritten with fraudulent information, then later admitted he had rewritten credit cards before.

25. After the interview was concluded, Officer Paine was able to verify that the aforementioned truck stop does have FedEx, UPS, and USPS outgoing mail boxes located there.

## VI. <u>TRAINING AND EXPERIENCE REGARDING ARROW KEYS</u>

26. Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a. USPS "arrow keys" are used by USPS mail carriers to unlock USPS "arrow locks" in order to (i) gain access to housing complexes or apartment buildings, and (ii) deliver mail to the respective mailboxes found therein (most commonly found in a mailbox panel). USPS arrow keys are also sometimes used to gain access to mail collection boxes in a specific area. In my training and experience, I have also learned that non-postal employees and mail thieves refer to arrow keys as "skeleton keys" or "shaved keys".

b. Mail thieves typically use stolen or counterfeit arrow keys to gain access to housing complexes or apartment buildings in order to steal mail from numerous mailboxes at the same time. Mail thieves also steal USPS arrow locks to make counterfeit arrow keys trough reverse engineering. Mail thieves make counterfeit arrow keys using a variety of tools, including Dremel tools. As a result of stealing mail, mail thieves can gain access to such items as checks, money orders, cash, and gift cards, as well as individuals' PII, and use such information to commit bank fraud, check fraud, and access device fraud with credit cards and debit cards.

## VII.  <u>TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT</u>

27. Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

28. People who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other PII (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

29. It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing PII for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal

information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

30. Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

31. It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the PII of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

32. It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

33. Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their

business.  Oftentimes, they do so on their digital devices.
Suspects often use their digital devices to communicate with co-
conspirators by phone, text, email, and social media, including
sending photos.

### VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

34. As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

35. Based on my knowledge, training, and experience, as
well as information related to me by agents and others involved
in the forensic examination of digital devices, I know that it
is not always possible to search digital devices for digital
data in a single day or even over several weeks for a number of
reasons, including the following:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  The digital devices are cell phones, computers, and a memory card capable of holding multiple gigabytes of data.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d.  Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

onto a hard drive, deleted, or viewed via the Internet.[3]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been
deleted, they can be recovered months or years later using
readily-available forensics tools.  Normally, when a person
deletes a file on a computer, the data contained in the file
does not actually disappear; rather, that data remains on the
hard drive until it is overwritten by new data.  Therefore,
deleted files, or remnants of deleted files, may reside in free
space or slack space, i.e., space on a hard drive that is not
allocated to an active file or that is unused after a file has
been allocated to a set block of storage space, for long
periods of time before they are overwritten.  In addition, a
computer's operating system may also keep a record of deleted
data in a swap or recovery file.  Similarly, files that have
been viewed on the Internet are often automatically downloaded
into a temporary directory or cache.  The browser typically
maintains a fixed amount of hard drive space devoted to these
files, and the files are only overwritten as they are replaced
with more recently downloaded or viewed content.  Thus, the
ability to retrieve residue of an electronic file from a hard
drive depends less on when the file was downloaded or viewed
than on a particular user's operating system, storage capacity,
and computer habits.  Recovery of residue of electronic files

_____

[3] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

            e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file

systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

   f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

   g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

36. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. <u>CONCLUSION</u>

37. For all of the reasons described above, there is probable cause to believe that HARPER and BROWN have committed a violation of Title 18, United States Code, Sections 1708 (Possession of Stolen Mail).  There is probable cause to believe

that the items listed in Attachment B, which constitute
evidence, fruits, and instrumentalities of violations of the
SUBJECT OFFENSES, will be found in the SUBJECT DEVICES, as
described in Attachment A.


_____/s/_____
MARLAYNA WATERS
United States Postal Inspector
United States Postal
Inspection Service

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>16th</u> day of
July, 2021.



_____/s/ Autumn D. Spaeth_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE